# **RECORD IMPOUNDED**

> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court."
> Although it is posted on the internet, this opinion is binding only on the
> parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3788-15T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

       Plaintiff-Respondent,

v.

H.D.C.,

       Defendant-Appellant,

and

R.B.,

       Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF T.R.C., a minor.

_____

       Submitted May 2, 2017 — Decided June 28, 2017

       Before Judges Messano and Grall.

       On appeal from the Superior Court of New
       Jersey, Chancery Division, Family Part,
       Essex County, Docket No. FG-07-194-15.

       Joseph E. Krakora, Public Defender, attorney
       for appellant (Anna Patras, Designated
       Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Casey Woodruff, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (James J. Gross, Designated Counsel, on the brief).

PER CURIAM

H.D.C. appeals a judgment of guardianship terminating her parental rights to one of her four children, Tara.[1]  Tara's father, R.B., does not appeal.  R.B. voluntarily surrendered his parental rights, but he conditioned his surrender on Tara's adoption by his sister, E.B., or her husband, H.Y.  An order entered with the judgment authorizes the Division of Child Protection and Permanency (Division) to file a complaint for Tara's adoption by E.B. and H.Y.  The Division and the law guardian oppose H.D.C.'s appeal.

For the reasons that follow, we conclude that the Division failed to establish termination is in Tara's best interest, as defined in N.J.S.A. 30:4C-15.1(a)(1)-(4).  Accordingly, we remand for further proceedings in conformity with this opinion.

---

[1] We have assigned a fictitious name to each of H.D.C.'s children to protect their confidentiality.

A-3788-15T4

The Division removed H.D.C.'s children from their home in January 2014. At that time, her son Tyler[2] was twelve; her daughter Tara was nine; her son Andy was two; and her daughter Ann was seven months old. The children were removed from the home they and H.D.C. shared with Andy's and Ann's father, A.A.W.

The Division removed the children on an emergency basis pursuant to N.J.S.A. 9:6-8.29, after substantiating a report of neglect and inadequate supervision evidenced by the children's poor hygiene, Tara's and Tyler's frequent absences from school, and Tara's and Tyler's burning Andy while they were playing with a cigarette lighter at home unsupervised. The substantiation came from the school's attendance records, foul odors emanating from the children, their soiled mattresses and clothing, Andy's healing burns, and Tara's account of how the burns were inflicted.

After removing the children, the Division separated them, by gender rather than age, and placed them with two Division-approved resource families. Two days later, a judge approved the removal and placement, directed H.D.C. and A.A.W. to return

---

[2] Tyler's father, E.B., Jr., was not located and default was entered against him on July 6, 2015.

on February 24, 2014, and directed the Division to provide weekly supervised visitation and promptly identify relatives willing to care for the children.

H.D.C. and A.A.W. never disputed the Division's justification for removal. They acknowledged placing the children in "an unsafe and unsanitary home environment, which exposed them to a substantial risk of harm." They admitted failing to "properly attend to the children's hygiene and grooming" and "properly supervise the children on the day that [Andy] was burned." And, they stipulated that those acts and omissions constituted abuse or neglect. On that stipulation, the judge found H.D.C.'s and A.A.W.'s conduct caused "a child's physical, mental, or emotional condition to be impaired or in imminent danger of becoming impaired . . . ." N.J.S.A. 9:6-8.21(c)(4).

The Division commenced its efforts to identify and address the causes for removal of the children when H.D.C. returned to court on February 24, and H.D.C. submitted to a drug test that was positive for marijuana. Apart from one refusal to submit to

a test in July 2014, H.D.C. did not have another positive result.[3]

On February 25, 2014, H.D.C. submitted to a psychological evaluation by Elizabeth E. Groisser, Psy.D.[4]  During that evaluation, H.D.C. acknowledged she had been smoking marijuana for several months and on a daily basis since her children were removed.  She claimed to have a history of panic attacks formerly controlled by medication and explained she was using marijuana to address anxiety.  H.D.C. admitted she was enraged when she learned her older children burnt Andy and hit Tara and Tyler with a belt.  H.D.C. stressed, and the Division caseworker confirmed, there was no evidence of injury attributable to that discipline.

---

[3] In its brief on appeal, the Division erroneously refers to a positive test for marijuana on February 13, 2014.  The positive test-result the Division references is from January 13, 2104, and it was done in connection with an unsuccessful complaint for custody filed by a relative in a non-dissolution case.  The trial judge recognized the date and circumstance of this test in his careful opinion.

[4] The trial court properly excluded complex opinions and diagnoses included in reports prepared by experts who did not testify at trial.  Accordingly, we do not address them.

In contrast, the judge ruled, again properly, that H.D.C.'s admissions and the recommendations made by non-testifying experts would be admitted for the limited purpose of evaluating the adequacy of the Division's efforts and H.D.C.'s compliance. Accordingly, we discuss such admissions and recommendations.

Dr. Groisser recommended: parenting classes; a drug abuse assessment; outpatient treatment; a psychiatric evaluation to determine whether H.D.C. would benefit from medication for anxiety[5]; and individual psychotherapy to develop skills to deal with "emotion dys-regulation" and anger.

H.D.C. initially declined treatment for drug abuse, but in April she submitted to an assessment and commenced treatment in the Bridge's Stepping Stones Program the day after she was admitted. By that time, Andy and Ann had been removed from their resource families and placed with A.A.W.'s parents.

In April, 2014, Tara, who was still living with a resource family, was evaluated by a clinical psychologist, Brett A. Biller. He reported Tara expressed interest in returning to her mother, recalled her mother doing "nice things" with her, and reported enjoying her weekly visits with H.D.C. Tara knew her mother had to "do something important" before Tara could return home and hoped to return soon.

Tara did not know why she and Tyler were with different resource families, and she mentioned that Tyler helped her with homework and played games with her. Tara also described

---

[5] During a subsequent substance abuse evaluation, H.D.C. reported that she was last treated for anxiety in Summer 2013 and was supposed to return.

positive interactions with her maternal grandmother in Georgia, and her maternal grandfather who lived closer. The child admitted to being worried "about things with the family" and wishing her "mother's attitude" and yelling would change.

For Tara, Dr. Biller recommended: family therapy to assist her with discussing her feelings and understanding such discussions would not jeopardize her relationships; a mentoring program; a psychological evaluation of H.D.C. to see if she has the appropriate insight to serve her children's needs; and a delay of reunification until H.D.C. was "able to maintain a secure physical and emotional home environment" and Tara was able to "safely communicate her feelings to her mother."

Apart from a December 8, 2014 order indicating that H.D.C. opposed mentoring for Tara, the record on appeal does not disclose any other services the Division offered for Tara.

In May 2014, Tara was placed with E.B., and H.Y.; Tyler was still living with a resource family. H.D.C., who been participating in the Stepping Stones program, requested and was given the opportunity to attend extra sessions. Thereafter, however, she missed six sessions in May. When the program-coordinator warned that H.D.C. was at risk of being discharged on May 30, H.D.C.'s attendance improved. She missed five appointments in June and two in August. H.D.C. was discharged

from Stepping Stones on August 12, 2014, with a recommendation that she receive "behavioral health counseling" and take any "medication that might be prescribed."

H.D.C. received the psychiatric evaluation. Ten days before that evaluation, H.D.C. was taken to the hospital by ambulance with severe symptoms of a panic attack, and six days after the evaluation, H.D.C. stipulated to abuse and neglect. The psychiatrist, Dr. Ambrose O. Mgbako, M.D., recommended H.D.C. receive the services of a psychiatrist for medication monitoring and cognitive behavioral therapy to handle panic attacks.

According to the program director for Stepping Stones, H.D.C.'s anxiety was still "untreated" in September 2014. The director reported that H.D.C. said she intended to seek mental health services at United Behavioral Health Center in July but had not followed through.

H.D.C commenced an eight-week parenting program with Family Connections starting on November 3, 2014. That program covered parenting styles, discipline, establishing and enforcing family rules, safety, peer pressure, sexual abuse prevention, anger management and parent self-care. She successfully completed that program on December 22, 2014.

H.D.C.'s effort came too late. On December 8, 2014, the judge approved the Division's request to file a complaint for termination of H.D.C.'s parental rights to all four children.[6] The December 8 order includes several reasons for the court's approval of the Division's decision to proceed with termination. H.D.C. had: "just re-started parenting classes, although the case has been open for nearly one year"; not followed through with recommendations of evaluating clinicians; failed to attend substance abuse treatment and counseling as recommended; not received "psychotropic medication monitoring"; not made meaningful progress toward reunification; not demonstrated commitment to parenting; and, continued to share a home in deplorable condition with A.A.W.

Throughout the litigation, H.D.C. and A.A.W. regularly appeared for weekly visitations with the children. The December 8 order includes a description of H.D.C.'s and A.A.W.'s behavior during those visitations. This description became important at trial because the only clinical psychologist who did bonding evaluations in this case, Dr. Peter DeNigris, relied upon it in

---

[6] At that time, the Division also sought termination of the fathers' respective parental rights — R.B.'s to Tara, A.A.W.'s to Andy and Ann, and E.B. Jr.'s to Tyler.

concluding that H.D.C. and Tara did not have a healthy bond.[7] The order states:  there were "interactions" that were "not particularly positive"; the adults focused their "attention" on the "younger children," while "largely" ignoring "the older children"; and H.D.C. was observed intimidating Tara.

The Division filed its complaint for guardianship on January 30, 2015.  By that time, H.D.C. had completed parenting classes and commenced individual sessions "to address parenting strategies and her past history of panic attacks."

The court ordered psychological evaluations of H.D.C. and the children's respective fathers and bonding evaluations in March 2015.  In July, Tyler was placed with his maternal grandmother in Georgia, and the first bonding evaluation was done in September.

During the hiatus pending bonding evaluations, H.D.C. did well.  She continued to pass every drug test, and on July 30, 2015, Family Connections reported she had succeeded in meeting all goals set for individual counseling and developing parenting strategies and effective means for dealing with stress.

---

[7] Dr. DeNigris did not review reports on the visits prepared by the supervisors.  We know that because he testified that he listed all materials he reviewed in his report and the list does not include those reports.

The problem at that point was that H.D.C. and A.A.W. had planned to co-parent all four children, as they had been before the children's removal. Because A.A.W.'s recent drug screens were positive for marijuana, H.D.C. and A.A.W. developed a plan to eliminate that barrier to reunification. During an August 3, 2015, case management conference, A.A.W.'s attorney advised that they agreed to abandon their plan to co-parent and would separate if one of them were ready to parent before the other. Up to that point, H.D.C. had no reason to look for different housing or a job because she and A.A.W. were living together in housing he had provided. Now she had a new challenge, finding and financing housing. There is no evidence that the Division provided any assistance on that front.

The paternal and maternal grandmothers — who, respectively, were caring for Andy, Ann, and Tyler — participated in the August 3 case management conference. Both were sworn before addressing the court. A.A.W.'s mother asked for assistance with promptly obtaining an appointment for Andy to see a specialist because he was "slightly autistic." The Division had an appointment scheduled for October, but A.A.W.'s mother felt Andy needed help sooner. Because H.D.C. and A.A.W. had not heard about Andy's autism until that conference, the judge directed the Division to keep them informed. Although the supervisors'

reports on visitation described Andy's uncontrolled behavior, there is no evidence that H.D.C. or A.A.W. ever received information on parenting techniques appropriate for such a special need.

The maternal grandmother reported that Tyler was doing well in Georgia and would start school on August 6. She told the judge she "would like [Tara] with [her] also,"[8] explained that Tara previously had been with her for five months and had friends and teachers she liked in Georgia and she regretted having sent Tara back to New Jersey.

Countering the Division's contention the she did not have enough space to accommodate Tara and Tyler, H.D.C.'s mother said she did not want Tara and Tyler separated and was confident she could find a larger dwelling. The judge directed the Division to follow-up. Although H.D.C.'s mother moved to a three-bedroom house to accommodate Tara, the Division was still awaiting an interstate-inspection of that home when trial commenced on March 11, 2016.

In December 2015, three months before trial commenced, Dr. DeNigris completed the bonding evaluations. Dr. DeNigris

---

[8] At trial, the Division's adoption caseworker testified that Tara's maternal grandmother first expressed her interest in having Tara live with her in September 2015, but the transcript of August 3 eliminates any uncertainty about the date.

defines bonding as "the affectionate attachment between a child and his or her caregivers that serves to join them emotionally and that endures over space and time." In his opinion, bonding is significant because it provides children's "template for future relationships," gives them a "sense of basic trust," and helps them develop favorable social emotions, cope with stress and reach their full potential.

Dr. DeNigris evaluated the bond between Tara and H.D.C. on September 10, 2015. His opinion on bonding was based on a forty-five to sixty minute observation of H.D.C. and A.A.W. with all four of H.D.C.'s children. At that time, Tyler was thirteen, Tara was ten, Andy was three and Ann was two.

At trial, Dr. DeNigris explained the duration of observation period was standard and, in his opinion, adequate to give him an accurate picture of the relationships regardless of the number of participants. The number of children involved did not make it "more difficult to observe the nature of the relationship" because H.D.C. and A.A.W. intended to care for all four children. In his report, however, Dr. DeNigris had recognized that H.D.C. and A.A.W. planned to separate if the Division deemed one of them unfit to parent, and, by the time of trial, H.D.C. was planning to parent alone.

Dr. DeNigris's written report on his observations during the bonding evaluation can be summarized as follows. On entering the room, Tara drew on a whiteboard, and Tyler sat by himself. H.D.C. and A.A.W. "immediately sat on the floor" with Andy and Ann. H.D.C. and Ann played with dolls. Showing her mother a doll, Ann said "Mommy, Look!" At that point, H.D.C. asked Tara if she wanted to join in, and Tara said "in a minute."

Tyler played with another toy on his own. H.D.C. told Tyler he always had to find something "weird" to play with, and he explained that it was "science." Ann said she was scared, and H.D.C. asked why. Ann did not explain, but said "Thank you, Mommy." While A.A.W. continued to focus on his son, Andy, Tyler, Tara, and H.D.C. sang a song to Ann. Andy then called, "Mommy look" and emptied a container of toys.

Dr. DeNigris did not observe any negative interaction between H.D.C. and Tara, but he reported comments H.D.C. made to Tyler that, in his opinion, were "derogatory" and "can only serve to harm the parent-child relationship." He noted, however, that when Tyler called Tara "ugly," H.D.C. responded by saying, "No. None of my kids is ugly. I'm gonna smack your brother because he keeps throwing pieces." He further noted,

A-3788-15T4

that as H.D.C. put toys away she remarked, "There's too much going on."

When Tara moved away from H.D.C. to look at other toys, H.D.C. asked her to bring back a specific game, "Jenga," which Tara did.  Tara and Tyler then played "Jenga" together.  Because Andy said he was sleepy, H.D.C. put him on her lap and they watched Tyler and Tara play "Jenga."  At trial, Dr. DeNigris acknowledged that H.D.C.'s having Tara return with the toy was a positive sign.

Noting that when A.A.W. and H.D.C. left the room at his request, the children "did not exhibit any overt distress" on "anticipated or actual separation," Dr. DeNigris indicated that the absence of distress demonstrated a weak bond.  In contrast, at trial Dr. DeNigris acknowledged that at Tara's age he would "be more concerned if there was distress," because children of her age "should generally be able to separate from the adults . . . who [they are] with" and that lack of distress in children of Tara's age on separation is not as relevant as it is with younger children.

Based on his observations, Dr. DeNigris reported these opinions:  "(1) a healthy bond is not present between any of the children and [A.A.W.]; (2) a healthy bond is not present between [Tyler, Tara, Andy] and [H.D.C.]; and (3) a healthy bond is

15

forming between [Ann] and [H.D.C.]." In reaching that opinion, Dr. DeNigris observed that H.D.C. and A.A.W. focused their attention on Andy and Ann, and they rarely gave attention to Tyler and Tara, even though Tyler and Tara would "vie for their birth mother's attention." Noting that the adults gave "noticeably less" attention to Tyler and Tara, Dr. DeNigris wrote, "This is consistent with the information contained in the records" reviewed.[9]

Importantly, in Dr. DeNigris's opinion, H.D.C. could not "serve as appropriate caretaker" for Tyler or Tara. The basis for that opinion was that he did not observe a "healthy bond" between the older children and their mother. He explained:

> In fact, [H.D.C.] directed most of her attention to [Andy and Ann], while paying significantly less attention to [Tyler and Tara]. This was a theme . . . noted in the background records and was something that was supposedly addressed with [H.D.C.] during visitations. Yet, her actions toward [Tyler and Tara] . . . remained unchanged."

At trial, H.D.C.'s attorney asked Dr. DeNigris if parents in similar circumstances generally need to pay more attention to

_____

[9] As explained in note 7 supra, Dr. DeNigris did not review the reports prepared by those who supervised the visitations. The judge reviewed the supervisors' reports and cited those exhibits in support of his determination that the visitation-reports revealed a pattern of favoritism for the younger and inattention to the older children.

younger children. Dr. DeNigris responded: "I would expect that a parent would be able to divide his or her attention appropriately among the two, three, four, however many children were in the room." He did not explain how, in his opinion, a parent could have divided his or her attention more "appropriately" in these circumstances.[10] Nor did he identify a standard accepted and applied by bonding experts to assess appropriate division of attention among children of different ages.

Dr. DeNigris's opinion on H.D.C.'s capacity to parent was also informed by his psychological evaluation of H.D.C. Acknowledging that H.D.C. "generally appeared to accept responsibility for how her actions and inactions contributed to her ongoing involvement with the Division, particularly by acknowledging her noncompliance during the early stages," he observed that she "seemed to minimize the problematic nature of some of the issues and/or to project blame onto others," especially when discussing her substance abuse, Tyler and Tara's absences from school and the deplorable condition of her home.

---

[10] On October 8, 2015, when Dr. DeNigris evaluated the bond between Tara and her paternal aunt and uncle, E.B. and H.Y., their thirteen-year-old daughter and twenty-year-old son, who both resided in the home, were not present. Tara was the only child there. Similarly, when Dr. DeNigris evaluated the bond between Tara and her father, R.B., no other child was present.

A-3788-15T4

In his opinion, H.D.C. could not correct the problems that lead to removal until she recognized them. If Dr. DeNigris considered reports from other Division consultants indicating that H.D.C. acknowledged responsibility for the children's removal in formulating that opinion, he did not mention them.

Crediting H.D.C. for the progress she had made, Dr. DeNigris opined that H.D.C. could become a "viable caretaker" for Andy and Ann but not for Tara or Tyler. He distinguished H.D.C.'s capacity to parent the older and younger children primarily on the absence of a healthy bond between H.D.C. and the older children. At trial, he stressed that H.D.C. could not meet Tara's needs, "[e]specially in the presence of the other children." In his opinion, H.D.C. would be overwhelmed.

Dr. DeNigris did not recommend H.D.C.'s immediate reunification with Andy and Ann. In his opinion, reunification should be delayed until H.D.C. had "individual psychotherapy" geared to give her insight on issues she needed to address and support to deal with "the added stress that [could] occur as reunification nears."

In his report, Dr. DeNigris recommended permanency for Tara with her brother Tyler and their maternal grandmother, because those children had expressed interest in living with her and she was willing to commit to providing them permanency. At trial,

he said he also believed the sibling connection would be beneficial for Tara.

Circumstances were quite different when trial commenced on March 11, 2016. Things changed dramatically two days earlier, on March 9. That is when R.B. tendered and the judge accepted his voluntary surrender of parental rights to Tara but conditioned his surrender on Tara's adoption by E.B. or H.Y. As a consequence of R.B.'s identified surrender, Tara's permanent placement with her grandmother recommended by Dr. DeNigris was no longer a likely option.

Equally if not more significant, on March 9, the Division sought and obtained the judge's approval to pursue reunification of Andy and Ann with H.D.C., but only after three to six months of providing H.D.C. the therapy Dr. DeNigris recommended in December 2015.

The Division's attorney, representing developments confirmed by the Division's adoption caseworker, explained the dramatic change in course as follows: "The conditions and circumstances leading to removal of the children are being corrected and it may soon be safe to return [Andy and Ann] home to [H.D.C.] in the foreseeable future because [H.D.C. completed] the services that were previously recommended for her including parenting skills and counseling." Elaborating, the attorney

19

advised that H.D.C. had recently:  submitted to a psychiatric evaluation by Dr. Sostre, and the Division was awaiting the doctor's report; been referred for counseling with Dr. Cox, which had not commenced; obtained a job; and "moved in with a family friend who agreed to the children residing there."

As to Tara, the Division explained that Dr. DeNigris had recommended H.D.C.'s reunification with her younger, but not her older, children.  The judge approved the Division's new plan for the younger children, and he dismissed Ann, Andy and their father A.A.W. from the guardianship action.

Because of R.B.'s identified surrender and the plan for reunifying H.D.C. with Andy and Ann, at trial, Dr. DeNigris was required to address circumstances very different from those existing at the time of his bonding evaluations.  In his report, Dr. DeNigris had not recommended Tara's placement with E.B. and H.Y., who were now poised to adopt her pursuant to R.B.'s voluntary surrender.  To the contrary, despite his generally positive impressions of Tara's interactions with her aunt and uncle during their bonding evaluation, Dr. DeNigris was concerned by disclosures Tara made when he spoke to her privately after observing her with E.B. and H.Y. in October 2015, and again after observing her with her father R.B., in December 2015.

On both occasions, Dr. DeNigris asked Tara how she was doing with E.B. and H.Y. In October, she said it was "Ok" and denied feeling nervous, worried or upset with them, but she also said she would be "nervous" if she were to remain with them permanently. Nevertheless, admitting she did not know her aunt and uncle when she moved to their home, Tara said it was "better." In December, Tara painted a different picture. Tara described E.B. as "mean at times" and noted she wanted E.B. to be her "last choice" for permanency. Explaining that E.B. never hit her, Tara said E.B. sometimes "yells and wants to hit me" and she feels "scared" at times.

Although Dr. DeNigris reported that Tara was forming a bond with her paternal aunt and uncle, he also said he was surprised the bond was "not more fully developed given the length of time" Tara had been living with them. Referring to Tara's December disclosures about E.B., he posited that those "dynamics could be preventing a healthy bond from fully forming." In Dr. DeNigris's opinion as of the date of his report, "it was unlikely" Tara would suffer severe and enduring harm if removed from E.B. and H.Y.

At trial, Dr. DeNigris acknowledged that if the dynamics Tara mentioned in December did not change, it could interfere with the development of a fuller bond between E.B. and Tara in

the future. Nevertheless, he believed E.B. and H.Y. could mitigate the harm Tara would endure if her bond with H.D.C. were severed, because they had been providing for her needs since May 2014.

Neither E.B. nor H.Y. testified at trial. Apart from information Tara provided when the judge took her testimony on the last day of trial, the only evidence about the state of Tara's relationship with E.B. at the time of trial was provided by Ms. Brown, the Division's adoption caseworker. According to Ms. Brown, she went to E.B.'s home regularly and asked Tara how things were going; Tara always confirmed things were fine. Brown discussed E.B. with Tara, and Tara had never said she was mean. Ms. Brown described E.B. as being a "stern" and "firm caregiver because she wants what's best."

Ms. Brown explained that the Division sought Tara's adoption by E.B. and H.Y. rather than placement with her maternal grandmother, as Dr. DeNigris recommended in his report, because it was a "more permanent plan" and Tara was doing well with E.B. and H.Y., both at their home and in her school. She explained the Division's preference for adoption by E.B. over placement with Tara's maternal grandmother, because it would devastate Tara if her grandmother accepted and returned her, as she had done in the past.

Adjusting his recommendation for placement of Tara with her brother Tyler and her maternal grandmother, at trial, Dr. DeNigris identified two benefits Tara would reap if she remained with her aunt and uncle — one less change and adjustment period and an opportunity for permanency. Dr. DeNigris defined permanency as the "need for security, stability, attachment and trust" and he explained it would give Tara a "forever family where she knows she would remain permanently, that she would not be moved again." In his opinion, permanency would "help address any feelings of confusion, any anxiety that [Tara] has, any sadness or self-blame, and low self-esteem." Dr. DeNigris explained that permanency is very important because "[w]ithout it, [children] live in that constant state of uncertainty where they can be moved at any time. Multiple moves, multiple adjustments [with] grief and loss at each stage."

In Dr. DeNigris's opinion, permanency was more important for a child of Tara's age than for Andy and Ann, because the need for permanency is greater for children "old enough to understand things on a different level . . . and that level of understanding could increase their questioning . . . and . . . feelings of . . . low self-esteem or anxiety, depression." Dr. DeNigris further opined that adoption was preferable to foster care, because adopted children, unlike children in foster homes,

do not live in a state of uncertainty and, consequently, have less anxiety, sadness and low self-esteem than foster children. His explanations referred to children in general, not to anything in particular about H.D.C.'s children, but he did not explain the basis for the generality.

Noting that Tara flip-flopped in stating her preference for permanency, Dr. DeNigris attributed her changing preferences to confusion related to the delay in permanency and to her feeling torn about selecting a preferred caregiver from the several adults in her life. Apart from that confusion, Dr. DeNigris, who had not done a psychological evaluation of Tara, did not indicate any problems Tara had with self-esteem, anxiety or depression.

Dr. DeNigris stressed that he would not support reunification of Tara and her mother, even if adoption were not feasible. In his opinion, if Tara were reunified with H.D.C. and that reunification failed, it would exacerbate feelings of anxiety, depression, low self-esteem, guilt and self-blame flowing from failed placements and leave her questioning whether she was contributing to those multiple placements.

Dr. DeNigris further opined that Tara would be at risk of "abuse or neglect" if reunified with H.D.C. He based that opinion on "the history of the case, the fact that the issues

24

that contributed to . . . [] her removal have not been remedied"; and observations from the bonding evaluation where . . . [H.D.C.'s] attention was focused almost exclusively on the two younger children" at Tara's expense.[11] In his opinion, whatever the placement, H.D.C. was not fit to parent Tara, and would be overwhelmed by caring for Andy, Ann, and Tara.

H.D.C. testified on her own behalf. She acknowledged that she had no relationship with Tara's father R.B. and did not have a great relationship with his sister, E.B. She did not agree with the Division's plan for Tara's adoption by E.B. and H.Y., because Tara did not like it with them and because H.D.C. felt it would be best for Tara if she were with her mother and siblings.

Tara was the last witness at trial, and Dr. DeNigris rendered his opinions without the benefit of her testimony or hypotheticals based upon it. The judge interviewed Tara on the record but not in the physical presence of H.D.C. or the attorneys, who listened from a different room. During that

---

[11] In his final decision, the judge interpreted Dr. DeNigris's opinion on risk of abuse or neglect as an opinion on risk of physical harm. Dr. DeNigris did not say that, and, as previously noted, there is no evidence that Tara sustained physical harm under H.D.C.'s care.

interview, the judge posed questions developed beforehand with input from the attorneys. Before posing any question, the judge ascertained that Tara understood her obligation to tell the truth.

Tara told the judge she liked living with E.B., her uncle and her twenty- and thirteen-year old cousins. She also said she had enjoyed spending summers in Georgia with her grandmother in the past and wanted to do that again; when they were together, she and her grandmother planted flowers and baked things. Tara also told the judge she felt comfortable with E.B. and said she cooked things with E.B. sometimes.

Tara's wishes for the future were to work with her brother Tyler in a bakery and participate in gymnastics and ice-skating. She also told the judge she spoke to her brother almost every week.

When asked if others were trying to influence her answers, Tara said she was not sure. She said E.B. had spoken to her about the interview. Tara also admitted being concerned about her answers hurting someone's feelings. She told the judge she would be sad if she did not live with Tyler, but she also said she would be sad if she did not live with her aunt, her uncle, her cousins, her mom, or Andy and Ann. Tara's response deviated only when she was asked about being sad if she did not live with

26

her father.  In R.B.'s case she replied, "I don't know about that."  As the judge noted in his final decision, Tara did not express any preference about her living arrangement.

Immediately before the judge delivered his oral opinion terminating H.D.C.'s parental relationship with Tara, the judge approved another change in the Division's plan for Tara's siblings.  Specifically, the judge gave the Division approval to forego termination of H.D.C.'s parental rights to Tyler and provide permanency for him with his maternal grandmother pursuant to the Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7 (KLG).

Like the Division's plan to reunify Andy and Ann with H.D.C. after affording H.D.C. three to six months of counseling, the Division's new plan for Tyler could not be implemented for several months.  That is so because Tyler had been with his grandmother for about nine consecutive months on March 9 when the judge approved the KLG plan, but his maternal grandmother could not even file her petition for guardianship under the Act until Tyler had been living with her for twelve consecutive months.  N.J.S.A. 3B:12A-5(b)(10).

As a consequence of the Division's court-approved plans for her siblings and R.B.'s identified surrender of his parental rights to Tara, Tara was the only one of H.D.C.'s children whose

mother-child relationship was at stake when the judge delivered his decision terminating her parental rights to Tara.

The judge addressed Tara's unique position among H.D.C.'s children immediately after he delivered his oral decision terminating H.D.C.'s parental rights. He did not address it in deciding whether the termination of H.D.C. was in Tara's best interest given this circumstance.

The judge raised the issue of Tara's unique position himself, after he delivered his decision and when H.D.C.'s attorney requested continuation of visitation pending appeal. The judge ordered one visit per month, and, addressing that visitation, the judge directed: "[T]here needs to be no talking or exchange between the mother and [Tara] about the paternal relatives [or] about where her siblings are going . . . ."[12] The judge noted the potential for Tara to "feel that it's because of her [that] she's not going home and yet her younger siblings are going home." The judge explained that Tara would likely think "the only difference between the siblings and her[,] is her. In

---

[12] The judge's concern echoed one expressed by Tara's law guardian during a colloquy on questions the parties proposed the judge address while interviewing Tara in camera. Referring to one question the Law Guardian exclaimed, "[W]hy on earth would you tell a little girl that your siblings will be going home to mommy but you can't. I mean that's horrible. I think that's awful."

other words, that it's her fault that the younger siblings are going home."  The judge elaborated:

> [Tara] know[s] her mother loves her, she know[s] her mother wants her and she could really feel responsible for herself not going home had she done something different.  And so any singling [sic] or comments about the younger siblings going home could invoke inadvertent or otherwise those feelings in [Tara].

To diminish the risk of this potential harm to Tara, the judge directed the Division's attorney to have Dr. Cox (who would be providing H.D.C. the therapy pending reunification with Andy and Ann recommended by Dr. DeNigris), and the Division's caseworker (who would be arranging H.D.C.'s monthly visitation with Tara and Tyler's kinship legal guardianship), to instruct H.D.C. on proper responses to the difficult questions Tara was likely to have.

## II.

A parent's right to a relationship with his or child may be terminated only if the State proves each of the four prongs of the statutorily defined best interest test by clear and convincing evidence.  N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 103 (2008).  The Division must establish that:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. . . . ;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights;
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

The four prongs "are not discrete and separate; they overlap to offer a full picture of the child's best interests." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 554 (2014). Ordinarily, the court must decide "whether the parents can raise their children without causing them further harm" and the evidence "focus[es] on past abuse and neglect and on the likelihood of it continuing"; the "inquiry is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992). "'The considerations involved are extremely fact sensitive and require particularized evidence that address[es]

the specific circumstance in the given case.'" R.G., supra, 217 N.J. at 554 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280 (2007) (citations and internal quotation marks omitted)).

In his oral decision, the trial judge addressed the evidence pertinent to each prong of the best interest test and concluded that the Division met its burden of proof. Where, as here, the judge had the opportunity to assess credibility and the special expertise in matters of child welfare attributed to judges of the Family Part, reviewing courts generally must defer to judge's factual findings supported by the record. E.P., supra, 196 N.J. at 104; M.M., supra, 189 N.J. at 293. "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., supra, 196 N.J. at 104.

This was a difficult case made more difficult by the dramatic eleventh hour changes in the permanency plans for Tara and her three half-siblings. Having recognized the potential for Tara to endure unique harm as the only one of H.D.C.'s children to have a severed mother-child relationship, the judge should have considered the specific circumstance of this case in addressing Tara's best interest. R.G., supra, 217 N.J. at 554.

31

The only expert testimony presented did not address that question.  Indeed, the expert could not have expressed an opinion on that subject because Tara was not in this unique position until the trial was over and the judge authorized the Division to pursue KLG for Tyler.

As the Supreme Court has instructed, in termination cases "[a] court must assure a complete and balanced presentation of all relevant and material evidence sufficient to enable it to make a sound determination consistent with the child's best interests."  J.C., supra, 129 N.J. at 22; see generally id. at 19-24 (discussing the appropriate use of expert opinions on bonding and differing schools of thought on its importance in the context of case where a parent's delay allowed the formation of a bond with a foster parent).  To that end, a judge "should not hesitate to call on independent experts . . . ."  Id. at 22.

We recognize the judge was dealing with the tension between securing permanency promptly and developing an adequate record.  There is no question that "[a] child's need for permanency is an important consideration" under the best interest test.  M.M., supra, 189 N.J. at 281.  But the case-specific circumstances in this case include:  a pending report on a recent psychiatric evaluation of H.D.C.; counseling for H.D.C. for three to six months; and a three-month waiting period before Tyler's maternal

grandmother could file a petition for his KLG.  In these circumstances, the judge could and should have, at a minimum, delayed issuance of his decision until the psychiatrist transmitted the report.

Moreover, as previously noted, Dr. DeNigris had reservations about Tara's bond with E.B. and provided only a conclusory explanation for his opinion that E.B. could mitigate the harm Tara would endure.  Similarly, Dr. DeNigris had not explained the basis for his opinion that H.D.C.'s division of her attention among her children was not appropriate or how that opinion supported his conclusion that H.D.C. would be overwhelmed if she were caring for Andy, Ann, and Tara.  Unsupported and unexplained expert opinion has no value.  J.C., supra, 129 N.J. at 23 (noting that "[t]he main point in weighing expert evidence is the fit between the expert opinion based on scientific theory and professional experience and the facts of the case"); id. at 22 (noting that "[a] particular theory suffices if it has substantial acceptance within the community of experts").

In addressing the first, second and fourth prongs of the best interest test, the judge relied in large part, albeit not exclusively, on Dr. DeNigris's opinions.  The importance of Dr. DeNigris's opinion to the judge's decision cannot be overstated.

33

Throughout his decision, the judge stressed that Dr. DeNigris's opinion, which he found credible, unimpeached and unrebutted, was the only expert opinion before the court. Indeed, Dr. DeNigris's conclusion that, with a psychiatric examination and additional therapy, H.D.C. could parent her younger children <u>but not</u> Tara or Tyler in the reasonably foreseeable future was the cornerstone for the judge's decision. Moreover, the judge recognized a risk of harm to Tara — her unique position among her siblings — that the expert had not addressed and the judge deemed to be sufficiently significant and complex to require an expert's advice on formulating appropriate responses to Tara's likely questions.

For all of the foregoing reasons, we reverse the judgment and remand for reconsideration of Tara's best interest in light of the potential harm from her unique position among her siblings. In reassessing Tara's best interest, the judge should also consider Dr. Sostre's report, H.D.C.'s progress or lack thereof in counseling and such updated or additional expert evidence the judge requires or permits. To the extent the judge relied on H.D.C.'s failure to secure housing in evaluating Tara's best interest, we also direct judge to consider whether the Division provided reasonable assistance to H.D.C. when she

34                                                                                          A-3788-15T4

and A.A.W. announced their intention to separate in the event that one but not the other were deemed ready to parent.

## III.

H.D.C. also claims entitlement to reversal based on the law guardian's failure to advocate Tara's interests and wishes as required by N.J.S.A. 9:6-8.23(a). We have considered the arguments offered on that point in light of the record and conclude they have insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed and remanded for further proceedings in conformity with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION